UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIAN S. WILLIAMS,

        Plaintiff,

v.                                                                            Case No. 1:04-CV-438
                                                                       Hon. Gordon J. Quist

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

                                       /

**REPORT AND RECOMMENDATION**

        Plaintiff brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying his claim for disability insurance benefits (DIB).

        Plaintiff was born on April 8, 1975 and obtained a GED (AR 44, 57).[1] Plaintiff stated that he became disabled on December 10, 2000 (AR 44). Plaintiff had previous employment as a construction worker, laborer, installer, care giver and factory worker (AR 52, 64-67). Plaintiff testified that he was self-employed in the construction industry from 1998 through 2000 (AR 215). Plaintiff identified his disabling conditions as osteoporosis, the inability to lift anything, the inability to sit or stand in one position for more than 20 minutes, and in constant pain (AR 51). After administrative denial of plaintiff's claim, an Administrative Law Judge (ALJ) reviewed plaintiff's claim *de novo* and entered a decision denying these claims on October 9, 2002 (AR 18-26). This

---

[1] Citations to the administrative record will be referenced as (AR "page #").

decision, which was later approved by the Appeals Council, has become the final decision of the Commissioner and is now before the Court for review.

## I. LEGAL STANDARD

This court's review of the Commissioner's decision is typically focused on determining whether the Commissioner's findings are supported by substantial evidence. 42 U.S.C. §405(g); *McKnight v. Sullivan*, 927 F.2d 241 (6th Cir. 1990). "Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Secretary of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). A determination of substantiality of the evidence must be based upon the record taken as a whole. *Young v. Secretary of Health & Human Servs.*, 925 F.2d 146 (6th Cir. 1990).

The scope of this review is limited to an examination of the record only. This Court does not review the evidence *de novo*, make credibility determinations or weigh the evidence. *Brainard v. Secretary of Health & Human Services*, 889 F.2d 679, 681 (6th Cir. 1989). The fact that the record also contains evidence which would have supported a different conclusion does not undermine the Commissioner's decision so long as there is substantial support for that decision in the record. *Willbanks v. Secretary of Health & Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). Even if the reviewing court would resolve the dispute differently, the Commissioner's decision must stand if it is supported by substantial evidence. *Young*, 925 F.2d at 147.

A claimant must prove that he suffers from a disability in order to be entitled to benefits. A disability is established by showing that the claimant cannot engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can

2

be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. *See* 20 C.F.R. §§ 404.1505 and 416.905; *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). In applying the above standard, the Commissioner has developed a five-step analysis:

> The Social Security Act requires the Secretary to follow a "five-step sequential process" for claims of disability. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)(2000)). Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)(2000)). Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Abbott*, 905 F.2d at 923.

*Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001). The claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work through step four. *Jones v. Commissioner of Social Security*, 336 F.3d 469, 474 (6th Cir. 2003). However, at step five of the inquiry, "the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Id.* If it is determined that a claimant is or is not disabled at any point in the

evaluation process, further review is not necessary. *Mullis v. Bowen*, 861 F.2d 991, 993 (6th Cir. 1988).

## II. ALJ'S DECISION

Plaintiff's claim failed at the fifth step of the evaluation. Following the five steps, the ALJ initially found that plaintiff had not engaged in substantial gainful activity since the alleged onset of disability (AR 25). Second, the ALJ found that he suffered from severe impairments of osteopenia, chronic back pain and a "Pain Disorder with GAF of 55" (AR 22).[2] At the third step, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of the Listing of Impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (AR 25). The ALJ decided at the fourth step that plaintiff had "the residual functional capacity for a range of sedentary work with a sit/stand option" (AR 25). The ALJ further concluded that plaintiff was unable to perform his past relevant work (AR 25).

At the fifth step, the ALJ determined that plaintiff was capable of performing a significant range of sedentary work (AR 26). Specifically, the ALJ found that an individual with plaintiff's limitations could perform 12,000 jobs in Michigan, such as gate attendant, addresser or ticketer (AR 26). The ALJ also found plaintiff's allegations regarding his limitations were not totally

---

[2] The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning" on a hypothetical continuum of mental health-illness. American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR)*, (4th ed., text rev., 2000), pp. 32, 34. The GAF score is taken from the GAF scale, which rates individuals' "psychological, social, and occupational functioning," and "may be particularly useful in tracking the clinical progress of individuals in global terms." *Id*. at 32. The GAF scale ranges from 100 to 1. *Id.* at 34. At the high end of the scale, a person with a GAF score of 100 to 91 has "no symptoms." *Id.* At the low end of the GAF scale, a person with a GAF score of 10 to 1 indicates "[p]ersistent danger of hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death." *Id.*

credible (AR 25). Accordingly, the ALJ determined that plaintiff was not under a "disability" as defined by the Social Security Act and entered a decision denying benefits (AR 25).

### III. ANALYSIS

> **A. The hypothetical and RFC did not take into consideration the severe emotional impairment of pain disorder with GAF of 55.**

Plaintiff contends that the ALJ did not address his mental limitations in either the hypothetical questions posed to the vocational expert (VE) or in the residual functional capacity (RFC) determination. I agree.

At the fourth step of the evaluation, the ALJ determines a claimant's residual functional capacity (RFC). The RFC is a medical assessment of what an individual can do in a work setting in spite of functional limitations and environmental restrictions imposed by all of his medically determinable impairments. 20 C.F.R. § 404.1545. RFC is defined as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs" on a regular and continuing basis. 20 C.F.R. Part 404, Subpt. P, App. 2, § 200.00(c); *See Cohen v. Secretary of Health and Human Servs.*, 964 F.2d 524, 530 (6th Cir. 1992).

If the ALJ determines that a claimant cannot perform his past relevant work, he proceeds to the fifth step of the evaluation, at which time he determines if other work exists in the national economy that plaintiff can perform. An ALJ's finding that a plaintiff possesses the capacity to perform substantial gainful activity that exists in the national economy must be supported by substantial evidence that the plaintiff has the vocational qualifications to perform specific jobs. *Varley v. Secretary of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). This evidence may be produced through reliance on the testimony of a vocational expert in response to a

5

hypothetical question which accurately portrays the claimant's physical and mental impairments. *Id.* However, a hypothetical question need only include those limitations which the ALJ accepts as credible. *See Blacha v. Secretary of Health and Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990). *See also Stanley v. Secretary of Health and Human Servs.*, 39 F.3d 115, 118 (6th Cir. 1994) ("the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals").

The ALJ's decision is inconsistent with the administrative record in this case. The decision states that the ALJ's hypothetical question included limitations due to plaintiff's mental impairments:

> The Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual of the claimant's age, education, past relevant work experience and residual functional capacity as determined (including a GAF of 55). The vocational expert testified that, assuming the hypothetical individual's specific work restrictions, he is capable of making a vocational adjustment to other work. The vocational expert testified that given all of these factors, examples of jobs suitable for the claimant to perform are as 12,000 gate attendants, addressers or ticketers. These cited jobs exist in significant numbers in the State of Michigan.

(AR 24).

However, the hearing transcript indicates that the ALJ's hypothetical question specifically excluded mental limitations:

> Okay. Hypothetical number two, same age, education, prior work. In this one I want you to assume the restrictions found by Dr. [Mulic] in Exhibit 5F. In that exhibit, Dr. [Mulic] restricted the claimant to lifting 10 pounds and found no mental limitations.

(AR 229). The VE responded that, based on this set of facts, plaintiff could not perform his prior work, but could perform 12,000 sedentary jobs (AR 229).

6

This hypothetical question does not support the ALJ's conclusion that "an individual of the claimant's age, education, past relevant work experience and residual functional capacity as determined (including a GAF of 55)" could perform 12,000 jobs (AR 24). The ALJ specifically found that plaintiff suffered from a severe impairment of a pain disorder with a GAF score of 55. The ALJ's reference to a specific GAF score suggests that the ALJ adopted the restrictions indicated by that particular GAF score. This GAF score falls within the 51 to 60 range, which indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR any moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR)*, (4th ed., text rev., 2000), p. 34.

The ALJ's finding that plaintiff suffered from a severe impairment of a pain disorder with a GAF of 55 necessarily amounts to a finding that plaintiff had some type of credible mental impairment. A psychological examination found that plaintiff suffered from an Axis I diagnosis of: "307.89  Pain disorder due to a general medical condition with moderate psychological/stress overlay" (AR 179).  This diagnosis, 307.89, is defined as a "pain disorder associated with both psychological factors and a general medical condition." DSM-IV-TR at 503.  Furthermore, a GAF score of 55, in and of itself, represents a clinician's determination that a person has "moderate symptoms" in his "psychological, social and occupational functioning." *See,* DSM-IV-TR at 32.  In the present case, plaintiff stated that he was a little depressed, gets only 2 hours of sleep per night, has memory problems and periodic thoughts of suicide  (AR 177-79).  However, despite the finding that plaintiff suffered from this severe impairment, neither the ALJ's RFC nor his hypothetical question posed to the VE referenced a mental or psychological impairment consistent with a GAF

of 55. Based on this record, it appears that the ALJ's RFC and hypothetical question should have included some type of restriction to account for plaintiff's "moderate symptoms" associated with his pain disorder and GAF of 55. *See Varley*, 820 F.2d at 779; 20 C.F.R. § 404.1545.

Accordingly, the ALJ's decision is not supported by the record. The undersigned recommends that the ALJ's decision be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g). On remand, the ALJ should re-evaluate plaintiff's mental impairment and incorporate it into an appropriate RFC and hypothetical question.

### B. The ALJ's decision fails to follow the Commissioner's ruling under SSR 00-4p.

Next, plaintiff contends that the ALJ failed to follow SSR 00-4p. The purpose of this ruling is as follows:

> This Ruling clarifies our standards for the use of vocational experts (VEs) who provide evidence at hearings before administrative law judges (ALJs), vocational specialists (VSs) who provide evidence to disability determination services (DDS) adjudicators, and other reliable sources of occupational information in the evaluation of disability claims. In particular, this ruling emphasizes that before relying on VE or VS evidence to support a disability determination or decision, our adjudicators must: Identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs or VSs and information in the Dictionary of Occupational Titles (DOT), including its companion publication, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO), published by the Department of Labor, and Explain in the determination or decision how any conflict that has been identified was resolved.

SSR 00-4p, 2000 WL 1898704 at *1 (S.S.A. Dec. 4, 2000).

Here, the VE testified that plaintiff could perform some 12,000 jobs in Michigan, such as gate attendant, addresser and ticketer. Plaintiff contends that the ALJ did not follow SSR

00-4p, because a conflict existed between the jobs listed by the VE and the description of the jobs in the Dictionary of Occupational Titles (sometimes referred to "DOT" or "the Dictionary"). Plaintiff's Brief at 6-8. Plaintiff relies on the court's interpretation of SSR 00-4p as set forth in *Teverbaugh v. Commissioner of Social Security*, 258 F. Supp.2d 702 (E.D. Mich. 2003). In *Teverbaugh*, the court summarized SSR 00-4p as follows:

> Occupational evidence provided by a VE . . . generally should be consistent with the occupational Information supplied by the DOT. When there is an apparent unresolved conflict between VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency. Neither the DOT nor the VE . . . evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . testimony rather than on the DOT information.

*Teverbaugh*, 258 F. Supp. 2d at 705-06.

In *Teverbaugh*, the court remanded the ALJ's decision after concluding that "the ALJ failed to question the VE regarding whether the jobs she identified as being consistent with Plaintiff's residual functional capacity (RFC) conflicted with the DOT" and that the "VE also failed to provide the codes for the positions that she listed, which would have enabled Plaintiff to consult the DOT to determine whether, in fact, a conflict exists." *Id.* at 705. In reaching this determination, the court held as follows:

> Because the VE's testimony was the only step five evidence that the ALJ relied upon, the Court cannot rule that there is substantial evidence to support the ALJ's findings. There are few decisions interpreting SSR 00-4p. However, those which have

9

> considered an ALJ's obligations under that ruling suggest that an ALJ's failure to carry its burden at this step is reversible error. *See Anschutz v. Barnhart*, 212 F.Supp.2d 1077, 1085-1086 (S.D.Iowa 2002)(Commissioner failed to meet burden of proving that jobs existed, where VE did not refer to the DOT and, therefore, did not identify specific jobs that could be performed.): *Steward v. Barnhart*, 44 Fed. Appx. 151 (9th Cir.2002)(unpublished)(Reversible error for ALJ to rely upon jobs listed by VE that required transferable skills, where the ALJ found that the claimant did not have transferable skills.); *Gallant v. Massanari*, 2001 WL 912406 (D.Me.2001)(Reversible error for ALJ to rely upon jobs erroneously listed by VE that were inconsistent with Plaintiff's RFC.).

*Id.* at 706. In *Teverbaugh*, the court stated that the ALJ had a duty "to ensure there was no conflict" and that where the VE failed to provide the claimant with the DOT job codes "there is no apparent means of determining whether the jobs identified by the [VE] are the ones that [the claimant] can perform." *Teverbaugh*, 258 F. Supp. 2d at 706. Under these circumstances, the court concluded that the VE's testimony was not substantial evidence sufficient to support the ALJ's decision. *Id.*

Plaintiff contends that the ALJ has "the affirmative responsibility to ask about any possible conflict between the Vocational Experts [sic] testimony and the information provided by the Dictionary of Occupational Titles (DOT)." Plaintiff's Brief at 6. The court disagrees with both the court's reasoning in *Teverbaugh* and plaintiff's contention that the ALJ has an affirmative responsibility to inquire into a possible conflict between the VE and the DOT. By requiring the ALJ to affirmatively question the VE's opinion at every administrative hearing, both plaintiff and the *Teverbaugh* decision imply that VE's opinion always conflicts with the DOT and that the DOT controls. Plaintiff's presumption that the VE's opinion is presumptively inconsistent with the DOT is unwarranted. The Sixth Circuit has rejected the argument that the Commissioner is bound by the DOT's characterization of occupations, holding that "the ALJ and consulting vocational experts are

10

not bound by the Dictionary in making disability determinations because the Social Security regulations do not obligate them to rely on the Dictionary's definitions." *Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003). *See also Conn v. Secretary of Health & Human Services*, 51 F.3d 607, 610 (6th Cir. 1995) (same).[3]

In *Donahue v. Barnhart*, 279 F.3d 441 (7th Cir. 2002), the court stated that the DOT "does not purport to contain rules of law, and no statute or regulation gives it binding force." *Donahue*, 279 F.3d at 445. The court discussed its approach for addressing the situation, like the present case, where neither the ALJ nor the plaintiff identified a discrepancy between the VE's testimony and the DOT at the time of the hearing:

> What, then, happens when the discrepancy is unexplored? When no one questions the vocational expert's foundation or reasoning, an ALJ is entitled to accept the vocational expert's conclusion, even if that conclusion differs from the *Dictionary's*--for the *Dictionary*, after all, just records other unexplained conclusions and is not even subject to cross-examination. If the basis of the vocational expert's conclusions is questioned at the hearing, however, then the ALJ should make an inquiry (similar though not necessarily identical to that of [FRE]Rule 702) to find out whether the purported expert's conclusions are reliable. Social Security Ruling 00-4p, promulgated in December 2000 (and thus not directly applicable to this case), is to much the same effect. This ruling requires the ALJ to "[e]xplain [in the] determination or decision how any conflict [with the Dictionary] that has been identified was resolved." (Emphasis added.) The ruling requires an explanation only if the discrepancy was "identified"--that is, if the claimant (or the ALJ on his behalf) noticed the conflict and asked for substantiation. Raising a discrepancy only after the hearing, as Donahue's lawyer did, is too late. An ALJ is not obliged to reopen the record. On the record as it stands--that is, with no questions asked that reveal any shortcomings in the vocational expert's data or reasoning--the ALJ was entitled to reach the conclusion she did.

---

[3] The Sixth Circuit shares this position with the Fifth, Seventh and Eleventh Circuits. *See Donahue v. Barnhart*, 279 F.3d 441, 445 (7th Cir. 2002)

*Donahue*, 279 F.3d at 446-47.

Under SSR 00-4p, the ALJ has a duty to "[i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence." While the ALJ has a duty to develop the record, the court does not view SSR 00-4p as requiring the ALJ to affirmatively interrogate the VE in order to establish that no potential conflicts exist between the VE's testimony and the DOT. As the court pointed out in *Buchholtz v.Barnhart*, No. 03-3235, 2004 WL 1088252 (7th Cir. May 12, 2004) at *6, "counsel has the responsibility for raising the issue [of a discrepancy under SSR 00-4p] if the ALJ does not." In the present case, neither the ALJ nor plaintiff's counsel identified any discrepancy between the VE's testimony and the DOT at the hearing. There was no reason for the ALJ to inquire as to whether the VE's testimony was consistent with the DOT. Accordingly, plaintiff's claim on this issue should be denied.

### C. The ALJ's decision fails to perform a function-by-function analysis of the claimant's mental capabilities.

Next, plaintiff contends that the ALJ failed to perform a proper "function-by-function" analysis of his mental capabilities. Plaintiff's Brief at 8-9. As the court previously discussed in § III A, *supra*, neither the ALJ's RFC nor the hypothetical question posed to the VE addressed the issue of plaintiff's mental impairment, even though the ALJ found that plaintiff had a severe impairment of a pain disorder with a GAF of 55 (i.e., moderate symptoms). Accordingly, plaintiff's mental impairment should be re-evaluated on remand.

> **D.    The RFC did not take into consideration the necessity to lie down during the day and be absent between three and six days a week per month [sic].**

Finally, plaintiff contends that the ALJ failed to take into account his need to lie down during the day and his chronic absenteeism. Specifcially, plaintiff contends that the ALJ failed to follow the treating source rule, 20 C.F.R. § 404.1527, with respect to plaintiff's treating physician, John Milcu, M.D. Plaintiff's Brief at 10.

A plaintiff's treating physician's medical opinions and diagnoses are entitled to great weight in evaluating plaintiff's alleged disability. *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Commissioner of Social Security*, 127 F.3d 525, 529-30 (6th Cir. 1997). However, an ALJ is not bound by the conclusory statements of doctors, particularly where the statements are unsupported by detailed objective criteria and documentation. *Buxton*, 246 F.3d at 773; *Cohen v. Secretary of Health & Human Servs.*, 964 F.2d 524, 528 (6th Cir. 1992).

The agency regulations provide that if the Commissioner finds that a treating medical source's opinion on the issues of the nature and severity of a claimant's impairments "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [the Commissioner] will give it controlling weight." *Id.*, *quoting* 20 C.F.R. § 404.1527(d)(2) (1997). In summary, the opinion of a treating physician is entitled to great weight, but must be supported by sufficient clinical findings and be consistent with the evidence. *See Melton v. Commissioner of Social Security*, No. 98-5671, 1999 WL 232700, *4 (6th Cir. April 12, 1999); 20 C.F.R. § 404.1526. Finally, the ALJ must

13

articulate "good reasons" for not crediting the opinion of a treating source. *See Wilson v. Commissioner of Social Security*, 378 F.3d 541, 545 (6th Cir. 2004).

Dr. Milcu initially examined plaintiff on January 8, 2001 (AR 99-101). At that time, plaintiff had no excessive pain behavior or pain complaints, moved with ease, had a full and painless range of motion of the cervical spine, had functional motion of the lumbar spine but complained of centralized pain in the lower lumbosacral area and at the thoracolumbar junction (AR 99-101). On January 18, 2001, the doctor felt that plaintiff had "osteopenia which may be related to lactose intolerance" but ordered a DEXA scan to quantify the osteopenia (AR 98). Then, on January 30, 2001, the doctor noted that the DEXA scan showed osteoporosis of the lumbar spine and "osteopenia approaching osteoporosis at the hip," described this as a mixed pattern of osteoporosis and osteopenia, and was "extremely concerned" because plaintiff was only 25 years old but "has osteoporosis which we do not see in men before the ages of 70 to 75" (AR 96).[4]

On February 13, 2001, Dr. Milcu completed a medical examination report for the Michigan FIA, stating that plaintiff suffered from chronic low back pain and severe osteoporosis, that his status was deteriorating and that it could improve with treatment (AR 105). Nevertheless, Dr. Milcu stated that plaintiff could occasionally lift up to ten pounds, use both arms for simple grasping, reaching, pushing/pulling, fine manipulating and that he could operate foot controls (AR 105). On January 21, 2002, Dr. Milcu noted that plaintiff suffered from osteoporosis and chronic

---

[4] "Osteopenia" is defined as "reduced bone mass due to a decrease in the rate of osteoid synthesis to a level insufficient to compensate normal bone lysis. The term is also used to refer to any decrease in bone mass below the normal." *Dorland's Illustrated Medical Dictionary* (28th Ed.) at 1202. "Osteoporosis" is defined as "reduction in the amount of bone mass, leading to fractures after minimal trauma." *Id.*

pain (AR 200). However, plaintiff was to be referred to the Ann Arbor Osteoporosis Clinic because "no one has been able to elucidate the cause of his osteoporosis" (AR 200).

In a statement from August 2002, Dr. Milcu stated that plaintiff suffered from chronic lumbosacral pain and osteoporosis (AR 181). Dr. Milcu also stated that plaintiff would not be able to perform labor due to his osteoporosis and that his chronic low-back pain would be aggravated by standing, prolonged sitting, bending, and twisting, and that plaintiff "has to lay down because of his pain" (AR 182). Dr. Milcu did not believe that plaintiff magnifies his symptoms and that in a typical month he would miss between three and six days of work (AR 182). The doctor further stated that plaintiff is able to follow instructions but "has a limited understanding of what's going on with his body" (AR 183).

The ALJ evaluated Dr. Milcu's opinions as follows:

> It is noted that Dr. Milcu has listed Osteoporosis as the claimant's diagnosis and that this resulted in an inability to work (Exhibit 21F). Conversely, Dr. Milcu opined that the plaintiff could occasionally lift 10 pounds and use his hands and arms for simple grasping, reaching, pushing/pulling, and fine manipulating (Exhibit 4F). In the opinion of the undersigned, only minimal weight may be given to Dr. Milcu's opinion since, in fact, the medical evidence does not substantiate a diagnosis of Osteoporosis but rather supports a finding of Osteopenia. Specifically, X-Rays in December 2000 demonstrated osteopenia of the claimant's lumbar spine (Exhibit 1F); Bone Density Test in January 2001, demonstrated a mixed pattern of osteoporosis and osteopenia (Exhibit 3F); and Bone Density Test on February 27, 2002, demonstrated osteopenia of the claimant's lumbar spine and hips (Exhibit 9F).

(AR 22).

It appears to the court that Dr. Milcu's records and opinions support a finding that plaintiff suffered from both osteopenia and osteoporosis. In April 2001, December 2001, January

15

2002, May 2002 and August 2002, Dr. Milcu identified plaintiff's condition as osteoporosis (AR 190, 194, 197, 200, 202, 205). In December 2000, plaintiff's x-ray indicated "[a]pparent osteopenia of the lumbar spine" (AR 89). In January 2001, a bone scan indicated that plaintiff had a mixed pattern of "osteoporosis/osteopenia" (AR 92). A February 2002 bone scan performed in Ann Arbor indicated that plaintiff suffered from osteopenia (AR 129-30).

Contrary to the ALJ's decision, Dr. Milcu did not set forth any restrictions in Exhibit 4F, which consists of the doctor's initial evaluation on January 8, 2001 and progress reports dated January 18th, 30th and February 8th (AR 93-101). Rather, these restrictions are set forth in Exhibit 5F, which consists of a "medical examination report" for the Michigan FIA dated February 13, 2001 (AR 104-05). It appears that Dr. Milcu's opinion changed between the time he completed the FIA form in February 2001 and the time he gave his statement in August 2002. In this regard, Dr. Milcu's office notes reflect that he ordered took plaintiff "off work" from at least August 2, 2001 through July 30, 2002 (AR 195-204).

The record appears to support diagnoses of both osteoporosis and osteopenia. Based on this record, it appears to the court that the ALJ has not articulated "good reasons" for giving minimal weight to Dr. Milcu's opinion that plaintiff suffers from osteoporosis. *See Wilson*, 378 F.3d at 545. Accordingly, on remand, the ALJ should re-evaluate the medical record to establish plaintiff's RFC.

## IV.     Recommendation

Accordingly, I respectfully recommend that the Commissioner's decision be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g) for the reasons as set forth in this report and recommendation.


Dated:  July 15, 2005                              /s/ Hugh W. Brenneman, Jr.
                                                   Hugh W. Brenneman, Jr.
                                                   United States Magistrate Judge



ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within ten (10) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).